Good morning, Mr. Casey. Good morning, Your Honor. May it please the Court, David Casey on behalf of the Massachusetts Delivery Association. This case concerns the federal government's exclusive power and responsibility to safeguard the national economy. To that end, Congress deregulated the air and ground transportation industries because they are the backbone of the nation's economy. Their cost structure and efficiency affect the cost and availability of every product and service in the market. In deregulating these core sectors, Congress also broadly preempted state interference through a preemptive construct that is as broad, if not broader, than any other in the entire United States Code. Not surprisingly, the Supreme Court and this Court have therefore construed the preemptive reach of Fed Quad A expansively. So the question here is whether a Massachusetts statute that prohibits motor carriers from engaging individual drivers as independent contractors violates Congress's preemptive deregulation of the ground transportation industry, particularly where, on the facts in this record, it is demonstrated that the Massachusetts independent contractor statute would force the elimination of certain services, modification of routes, and more than double labor costs such that the providers would either have to raise rates and prices or go out of business. Starting, as we must, with the language of F Quad A, we find that Congress didn't say to the states, don't regulate ground transportation. It said, rather, don't pass or enforce any law or any provision that has the force or effect of law that relates to prices, routes, or services. And the legislative history further emphasizes the point that there was a particular California statute that Congress had in mind that had provided significant competitive disadvantages to independent contractors in the trucking industry in California. So we have a statute that's on its face, is extraordinarily broad in a legislative history that says independent contractors are part of this industry and they shall be protected. Indeed, the Ninth Circuit, which, if anything, has been an outlier in the jurisprudence under F Quad A, in two different cases, the American Trucking Association versus Port of Los Angeles case, and more recently in the PAC Anchor case, has said twice, we clearly recognize that states can't ban the use of independent contractors. But that is precisely what the Massachusetts Independent Contractor Statute does here. Now, the district court found that the statute was not preempted because it did not directly target the transportation industry and because its effect on prices, routes, and services was indirect. But those are of no moment in light of the various Supreme Court decisions and the decisions of this court, which have said that background laws, to use the Attorney General's phrase, background laws, even negligence claims, interference with advantageous relations claims, implied covenant of good faith and fair dealing claims, what could be more background than those? Even common law claims are preempted if in application in the real world they have more than a tenuous, remote, or peripheral effect on prices, routes, or services of a motor carrier. In our case, because the B-prong of the statute bars the use of independent contractors, the provider, if they were to convert to an employee-based labor model, would be subject to the myriad restrictions that employment protective legislation provides. And in essence, they focus on two issues, labor cost and labor availability, and they are at the core of the delivery service model. I have some sympathy for the district court, which has to deal with difficult questions, particularly those posed in the aftermath of Dan's city. Could you tell me, please, what effect do you think that Supreme Court decision has on interpretation of the statutory preemption language? I think it's limited, Your Honor. I appreciate Dan's city, but Ginsburg follows Dan's city. And the way I would answer it is with a hypothetical. If the office manager of Expressman, our exemplar in this case, who is an employee, if she were to claim that she is improperly classified as exempt and sued Expressman on that basis, it seems to me that that type of action is remote in relation to delivery prices, routes, or services. Just as the disposition of a vehicle that had been towed months previously was not related to what tow trucks do when they tow vehicles. The district court interpreted Dan's city as requiring that the statute be specifically targeted to the transportation of property. Right. Do you say that that is legal error? It is. I mean, this Court's de fiore decision. The TIF statute doesn't target. I'm sorry, but, you know, one of our decisions before the Supreme Court decides something is not a good response to what did the Supreme Court mean. We haven't addressed this issue flatly. So let's, your response is, well, it would be inconsistent with prior law, but the Supreme Court can certainly do that if it wants. No, forgive me for not emphasizing again the Ginsburg case. All right. Northwest Airlines versus Ginsburg was decided in, I believe it was May of this year, after Pelkey versus Dan City. And in that case, the Supreme Court said that an action to expand the rights under a frequent flyer contract that sounded in the implied covenant of good faith and fair dealing is nonetheless preempted as applied to the facts of the case. And the point, I think, Your Honor, is that if an implied covenant of good faith and fair dealing abstraction can be preempted as applied, then that is completely inconsistent with the notion that the underlying law has to somehow specifically target transportation or target in any direct way prices, routes, or services. So I think that Ginsburg is enormously important to the resolution of this case and is the Supreme Court's most recent word on it, which cited favorably this Court's decision in Brown versus United Airlines. Even if your interpretation of Dan City and its application of this case is correct, what remedy would you seek? Are we in a position, even if we accept your view on that issue, to do anything more than to remand to the district court? Well, you can enter judgment on the notion that the B-prong is preempted. But how can we do that? The district court has made no findings at all as to whether or not the B-prong has a substantial effect on the industry. You've made a lot of arguments that it does. Those arguments have been contested. We've got no finding below. Wouldn't we have to remand so the district court can explore that issue? You certainly could remand, but I don't think it's necessary because of our alternative argument, which is that the statute is also preempted on its face in that barring the use of independent contractors frustrates Congress' overwhelming, overarching goal of creating a uniform national market. As to transportation, that's the flaw with your facial. This statute applies everywhere. And Congress is only concerned with transportation, with airlines, with motor vehicles. So, sorry, but you have to get back to Judge Salyer's question. The remedy we seek is exceedingly narrow. We're not seeking a declaration that the Massachusetts independent contractor statute violates anything other than F-Quad A and then only the B-prong. It is an exceedingly narrow remedial request. And because of the effect of the B-prong, it is manifest that regional and national carriers can't operate their same-day delivery services in this state, which, again, is contrary. That's your argument. But the Commonwealth is arguing that even if you're right on how Dan City is interpreted and how the with respect to language should be interpreted, that you have vastly overstated the effect of the B-prong. And why aren't they entitled to an opportunity to show that, to have that issue contested in the district court and see if you can carry your burden of proof as to the effect? Well, let me see if I can answer it this way. They had nine months to conduct discovery. We gave them 30,000 pages of operational and financial data. They took the CEO's deposition for two days. They had both of our expert reports for 60 days and didn't oppose any of it. And the district court implicitly found that we had created an uncontested record demonstrating the catastrophic effect on prices, routes, and services resulting from the effect of the B-prong. I may have understood the district court opinion differently than did Judge Selya, but I thought she essentially said with all of your best evidence, you hadn't shown that it was related to a price, route, or service, that your evidence simply didn't meet the criteria for that, in which case your argument is, and the way I understood your brief was, that's just wrong. Well, that is wrong on her part, and she was applying the wrong legal framework to the factual proffer. Okay, so let's say even if we agree with you on the price, route, or service, you've still got the with respect to the transportation of property. There are two with respect to issues in the case. Is there anything that is left of that issue? The Attorney General doesn't take a position on this. It would seem to be pretty obvious that, given it's a delivery service, that it has to do with the transportation of property. These drivers don't operate close to the execution of service. They provide the service. There is no mystery there. And also, with respect to the transportation of property, it's not an independent element of the cause of action. It modifies price, route, or service in the statute. So I think the district court just had it wrong on that. Maybe it does, maybe it doesn't. But there's no debate about the fact that these drivers do nothing but pick up and deliver products. If, for example, one of them was stopped for speeding, that's a different issue. We're not talking about something that is remote or peripheral to the basic service here. Rather, we're talking about the people who provide the delivery of property for a fee. If we were to say the district court misapprehended or misapplied the statute, what else would you show on remand? Do you have more evidence? No. We are content with a factual record. All right. Anything else? I would leave you with this thought, Your Honor. Congress said to the states, don't regulate and don't even get close to regulating ground transportation. And what Massachusetts has done is they have imposed on delivery service providers the most highly regulated relationship in American law. You know, I tend to read the statute as prohibiting, as requiring that people who would otherwise be independent contractors be employees for purposes of this law. The briefs refer to some district court decisions that say that ain't necessarily so. The B clause doesn't require that you stop doing business with independent contractors as part of your delivery services. What was the theory of those? A couple of things. The district court decisions didn't have our factual record. The plaintiffs in those cases were challenging the independent contractor statute as a whole, not just prong B. And I think they got it wrong. Thank you. Thank you. Mr. Sachs. Good morning, Your Honor. Peter Sachs, state solicitor representing the Appalachian Attorney General, Martha Coakley. First, I want to respond to the point that Section 148B is somehow a ban on the use of independent contractors. That is absolutely not the case. In fact, the same district judge faced with two different sets of facts or two different claims that delivery services had misclassified their employees under 148B said in the Debnam case that, no, the delivery service had properly classified drivers as independent contractors under 148B, whereas in the HomeDeliveryAmerica.com case. Can you give me the theory? Yes. Excuse me, Judge Lynch. Debnam really is not this case because in Debnam, the independent contractor had incorporated and was running as a corporation and his corporation itself had several employees. What the district court found was that his corporation couldn't be considered an employee under 148B. So that's far from this case. And it suggests, I mean, that's what I thought the rationale was. And it suggests that, oh, all right, so you independent contractors have to go out and you all have to incorporate. And then you'll avoid the statute that way. And that itself is going to impose a series of burdens. No. 148B does not require single drivers to incorporate. 148B, prong B, which is the one challenged here, requires that the worker be performing a service outside the usual course of the employer's business. And if the employer is in the business of arranging deliveries, and that's what the employer is paid for, whereas the driver is in the business of providing deliveries and has independence and has control and has the ability to do deliveries for other delivery services, then prong B could be satisfied. You said prong B applies to the facts of this case, haven't you? I'm sorry, that prong B applies? You're trying to enforce this statute against Mass Delivery Association and this economic model. Well, we're saying that while Expressman, under its current model, may not be able to pass prong B, it probably can't pass prong A either, which means that the control. Yes, that's a different argument. But prong B does not per se. I thought your position was prong B applies to the facts of this case. Prong B applies to the facts of this case, but prong B does not per se ban independent contractor drivers in the delivery industry, which is what Mass Delivery Association is arguing. If we are in an as-applied mode of analysis, haven't you just conceded enough? No, because their argument depends on showing that prong B has this broad effect throughout the industry, and it does not. Expressman could restructure its operations so that it could legitimately have independent contractor drivers on other delivery services by giving drivers control by permitting them to, I think as they already do in some cases, to drive for other services and by taking other steps that would allow them to function as they are in their own business, which would be providing deliveries. Instead, Expressman holds itself out as providing deliveries, and its drivers do just that. They are operating in the course of Expressman's business, not their own business, but they could provide delivery services, and Expressman could provide the service of arranging deliveries. Now, the F-Quad A does not preempt laws that merely affect an employer's business model or a motor carrier's business model. The F-Quad A preempts laws that regulate prices, routes, or services, and a background law such as 148B that only regulates the employment relationship, that only regulates one of the inputs into what motor carriers provide, rather than the services or prices or routes that they provide, is not preempted. The Seventh Circuit's decision in S.C. Johnson lays this background law analysis out very clearly, relying in part- The situation there was decidedly different. That particular case concerned state RICO and bribery laws, but the Ninth Circuit quite recently has applied that same background law analysis to hold that California's meal and rest break laws are not preempted as applied to delivery services. Your background law analysis concept is very broad and would seem to eliminate attention to the language of the federal preemption statute, which does not say background law, does not say states are free to do whatever they want to ensure certain wages and hours to people who do work for other people. So that's a- can we just- I know it's a handy shorthand, but that's the problem with handy shorthands. They lack precision. Well- So what is it here that you say this law does not have any effect on price, route, or service? It relates to prices, routes, or services in at most a remote, tenuous, or peripheral manner, which is what the Supreme Court said is not enough to cause preemption. And the Down City case, interestingly, incorporated into the F-Quad-A context the analysis that the Supreme Court had previously adopted under ERISA in the- for related to preemption. There in the New York State Blue Cross Blue Shield versus travelers case, the Supreme Court said you can't give an- you can't interpret the phrase related to with uncritical literalism. You need to look at some- and find some sensible limitations on that, cutting back on the early interpretations of ERISA preemption. And the court said in travelers, even basic regulation of employment conditions will invariably affect the cost and price of services. But even so, preemption does not occur if the state law has only a tenuous, remote, or peripheral connection with covered plans. So Down City talked about needing to not apply the- related to preemption with uncritical literalism. And interestingly, the courts that have adopted the background laws theory, SC Johnson, DILTS, holding California's meal and rest break laws not preempted, and BVEX, Costello versus BVEX, which specifically held Illinois' three-pronged test, or who's an employee not preempted as applies to motor carriers, all of them cited in one way or another and relied on this court's analysis in De Fiori. In De Fiori, this court rejected the airline's argument that state regulation, if preempted wherever it imposes costs on airlines, and thus affects fares merely because costs must be made up somehow. The court said this would effectively exempt airlines from state taxes, state lawsuits of many kinds, and perhaps most other state regulation of any consequence. Obviously, that's not what Congress intended to do. The legislative history is quite clear about that. In fact, when- Do you agree with the district court that Down City means that the state statute at issue must be specifically targeted to the transportation of property? We don't agree with the district court's specific application of Down City. I don't think we know yet exactly what Down City means in terms of its focus on the- Yes, but we have to decide the case. Yes. So could you take a position? This law is no more related to the transportation of property, in fact, probably less so than the law in Down City, which was held not sufficiently related to be preempted. Down City was a law about how you can sell property after it gets transported. 148B is a law about how you classify workers as either employees or independent contractors. So certainly on its face, this has less to do- So it was a classic issue, wasn't it, of federal regulation before the deregulation? Wasn't federal law largely concerned with independent contractors being able to do business in the transportation area? It was a specific concern. It was not largely concerned with that. There was federal regulation of prices, routes, and services, which is what Congress got rid of and why they preempted state re-regulation of prices, routes, and services. My brother referred to something in the legislative history about California treatment of independent contractors. What the legislative history shows is that while California had deregulated trucking, it had not fully extended that deregulation to companies that used a lot of independent contractors and therefore California hadn't gone far enough. And this was part of the reason why Congress needed to act to preempt any state regulation of prices, routes, and services. But there was not a special concern shown with ensuring that independent contractors could function in any particular way in the motor carrier industry if it didn't affect- Let me come to Judge Lynch's question from another direction. Ann City, at least as I read it, was interpreting what was meant by the phrase in the F-Quad A with respect to the transportation of property and determined that the statute there was not sufficiently within that classification. I don't understand the argument you're making today as agreeing with the district court that this statute is not with respect to the transportation of property. I understand your argument as being that this statute doesn't sufficiently relate to prices, routes, and services. That is our primary argument. And the district court also held, based on De Fiore, that the F-Quad A did not constitute a blank check to the motor carrier industry to get exemption. Yes, but if we were to disagree with you hypothetically on it being related to a price, route, or service, what is your position on the other question, whether the statute is sufficiently related to the transportation of property? The question would be whether it has a significant impact on prices, routes, and services, and it does not. And the burden of proof is on- That's what I just asked you to assume. Could you answer my question? Are you looking at the factual question? With respect to the transportation of property. If we are assuming that this is a statute with respect to the transportation of property- No, no. No, no. I'm sorry. We assume the other prong has been met with respect to prices, routes, or services. What is your position on whether the statute is with respect to the transportation of property? It does not seem like it is any more than the law was in Dan City, but even if it is, our position is that- Your primary position is the- Relates to- Related to- Is that it's not sufficient. It's related in only a remote, tenuous, or peripheral manner. But now, can we answer that question? I don't- On this record, or do we need some fact-finding in the district court? Because your argument, as I understand it, is really not that the statute doesn't relate to prices, routes, and services in some sense. But that its relationship to prices, routes, and services is remote, whatever that trilogy is. Yes, remote, tenuous, and peripheral. Yes, remote, tenuous, or peripheral. And isn't there some fact-finding that has to be done to determine the difference between a remote effect and a more substantial effect? We don't believe there's any further fact-finding that needs to be done. MDA put its best test case forward through Expressman, and it hasn't met what is its burden to show a significant effect. First of all, it vastly exaggerates the number of laws triggered by 148B. Secondly, as to the- So you're asking for an affirmance, but if you don't get-if we don't agree with you as to the law, you are not asking for a remand. You are for further fact development. The record is complete as far as you are concerned. Well, we opposed summary judgment on 5060 grounds, and that was a- But even so, with the best case that MDA has put forward, they haven't shown a significant impact. But suppose we look at that evidence and say, okay, if you take that evidence unopposed and draw inferences from it favorable to the MDA, all right, are you saying that you don't-you are now abandoning your 56D position, that you don't want a chance to develop the factual record in opposition? No, we think even taking all the inferences favorable to them- Yeah, I know you think that, but that doesn't answer my question. Suppose we disagree with you on that. Are you abandoning your request for 56D relief? If you're saying-if the court concludes that they've made a prima facie showing of significant impact on any of these laws, then no, we don't abandon our 56D position, and the case should go back. So you want a chance to show that that prima facie case is less substantial than they were- Yes, but as argued in the brief as to each specific law triggered by 148B, they have not shown a significant impact. All right, suppose we disagree. What sort of evidence would you come up with? Well, we did not complete the deposition of Expressman's president, Michelle Colley. We did not get some of the documents we needed from Expressman. And depending on the particular areas in which this court hypothetically might identify where there could be significant impact, we may need to go back to the experts that MDA put forward to identify the supposed impacts on prices, routes, and services. We believe that from the face of this record- I've forgotten, did you have your own experts? We do not have our own experts, no. Thank you. Thank you.